v. Waters. Thank you so much. Good morning, Your Honors. I'm Stephen Warshawsky for Defendant Appellant Dr. Pierre Kory. May it please the Court, this is an appeal from the District Court's denial of Dr. Kory's motion to dismiss, which was asserted on grounds that Dr. Kory is immune from suit and liability under the Federal PrEP Act for plaintiff's claims arising from Dr. Kory's treatment of the decedent, Mr. Waters, for COVID-19 in December of 2021. The HHS Secretary invoked the PrEP Act effective February of 2020 in response to the COVID-19 pandemic. This case falls squarely within the immunity provisions of the Act because in this particular case, the plaintiff himself alleges that Mr. Waters was injured and ultimately died as a direct result of the high-dose prednisone that was prescribed by Dr. Kory to treat Mr. Waters for COVID-19. So all the elements of immunity under the statute apply in this particular case. Now, the failure to prescribe the gastrointestinal prophylaxis, that's not a covered countermeasure, right? Well, the failure to prescribe something is not a covered countermeasure. But in this particular case, what we have is a very broad immunity provision that covers all harms. Harm is the key. Caused by a countermeasure, including any harms that related... Is it harm or loss? I'm sorry? Is it harm or loss? It's loss. Right. All claims for loss. And here, the claim for loss is the injury and the death. The prophylaxis is directly related to the covered countermeasure because the plaintiff alleges that it was part of what would be required to safely manage the prednisone therapy. But he had comorbidity issues, right? He also had gout for which he was prescribed steroids. The same treatment, right? Not just for COVID. I think his medical records show that he had been prescribed steroids for various conditions. In the past. So this is not a new... The steroid treatment treated both the gout and the COVID, correct? I mean, no doubt the doctor indicated he prescribed the hospital for COVID, but he had been on steroids for gout. And the countermeasure, the HR blocker, is something that's routinely given to patients who are on steroids to prevent precisely the type of side effect that in this case is alleged to have caused his death. Well, that's the plaintiff's allegation of negligence. That's correct. We, of course, dispute that, but this particular case at this stage is about the immunity provision. No, I understand it's about the immunity provision, but I'm trying to understand how this is different. And I know the Solomon I and II case, I know Solomon II was decided on the remand, whether it was appropriate to have this case be in federal court. But the district court addressed the issue of the treatment in that case was someone is put on a ventilator to treat COVID-19, but then they're not moved. They're not rotated and they die as a result of an injury for failure to take that sort of preventative measure. It seems like this is that type of case here. It isn't the treatment for COVID precisely that caused the death, but a side effect to one of the medications he was on, the steroids. I think that's incorrect, Your Honor. This case isn't that case because the plaintiff's theory of harm is precisely that the ulcer was caused by the covered countermeasures, by the prednisone therapy. So unlike, say, the ventilator cases or unlike the case of Mills, we don't have an allegation where the plaintiff is not, we don't have a case in which the plaintiff is not claiming principal harm by a covered countermeasure. Here, in fact, the plaintiff's allegation is the harm was caused by the prednisone, which is a covered countermeasure. That's like a vaccine case. I'm sorry? It's the prednisone without the prophylaxis, though, right? Well, that's a theory of negligence, but the prednisone itself is the covered countermeasure that is causing the harm. How is that different from the ventilator? The ventilator is what caused the harm because the prophylactic measure of moving, turning the patient didn't occur. How is that different? Well, because in the Solomon case, they're not claiming that the active ventilation, the use of the ventilator itself caused any harm to the patient. And here, they're not claiming the use of the prednisone here caused the side effect of the ulcer. Yes, they are. The same thing as the ventilator, though. The ventilator, the use of the ventilator without turning the patient caused the patient to be stationary, right? I disagree, Your Honor. In fact, the plaintiff is directly alleging that the ulcer was caused, in fact, by the prednisone. The theory of liability, the theory of negligence, is that in administering the prednisone, and this brings us again within the scope of the immunity provision, that there was negligence in the administration of the prednisone because they claim that the prednisone should have been administered in conjunction with the prophylaxis. But it's admitted... Just like it was when he was in the hospital and treated in the same course of treatment, then that would... I'm struggling. Help me understand how it is commonly known that when somebody is on a high dose of steroids, these countermeasures should be used, correct? The prophylactic measures of the HR blockers or other medication to prevent an ulcer. Some people within the medical community hold that view, but that's not the view that Dr. Corey holds, and that's not the view of recent research. Well, that may not be his view, but the point is that it's a common treatment or a common measure used when somebody is put... Just like if you put someone on a blood thinner, on Coumadin, you're going to have to make sure that you measure the Coumadin levels, that it doesn't cause something else. So I guess I'm struggling with how someone like your client with comorbidity that is receiving steroids for two conditions, COVID-19 and gout, then isn't given the proper medication that he was given when he was in the hospital treated by other doctors, that that enables your client to have immunity under the immunity provision. Well, because the... I'm struggling with that. Because PrEP Act immunity supersedes issues of negligence. You don't have to establish that you met the standard of care in order to get immunity. In fact, as the Oklahoma Supreme Court pointed out in response to this very argument in the Franklin case, which I submitted to the court over the weekend, they pointed out that conditioning immunity under the statute on meeting the standard of care turns the statute on its head and renders it a nullity. I understand that. So it's not a standard of care question. I understand that if it was the prednisone alone without the prophylactic measure. I guess what I'm struggling with is the case law also says that the immunity provision should be read more narrowly to cover the treatments that are directly related to COVID because it's a new... It's a pandemic and the idea was to try to treat people. So I don't know how that reading it narrowly covers this other medicine he should have been on. Well, this case law, I think, says that the immunity provision under the PrEP Act is quite broad. I think the issue, though, is once you zero in on are you talking about a covered countermeasure causing the harm, that's when immunity is triggered. The covered countermeasure in this case is the prednisone. The plaintiff himself alleges that that was the principal cause of the ulcer. Therefore, since you have harm caused by a covered countermeasure, immunity under the statute is triggered and now you fall into a different way of handling those issues that Congress decided under the PrEP Act. So again, it's not a question of theories of negligence. It's a question of mechanisms of harm. And so long as the harm is caused by a covered countermeasure, then the immunity is triggered. And that's why this case is different than cases, for example, that there was an argument about a failure to use a countermeasure or something which didn't constitute a countermeasure. This is squarely within the scope of PrEP Act immunity. And could you just for me, one more time, talk about how you would distinguish the Mills case? So the Mills case would be distinguished on several grounds. As the court itself and Mills pointed out, the plaintiff herself did not allege that the harm she suffered was actually caused by the covered countermeasure in that case. Mills is a unique, is an interesting case because the covered countermeasure was a COVID-19 test. And the connection to the plaintiff's treatment was the delay in giving the treatment. And what the plaintiff said is, the test really was separate and apart from the treatment. You could have given the treatment. There was no reason for the delay, but this is really a completely separate issue, even under your own regulations. If you had diagnosed me properly, I would have been allowed to be treated regardless of the COVID test. And I think that that's what the Mills court really zeroed in on. And as they say in the decision, we are relying on the allegations of the plaintiff in the case. I think if the plaintiff had made a more explicit argument that because they waited for this COVID-19 test, that delay resulted in my harm, I think there'd be a little bit more difficulty in squaring that with the steroids per se. It was the failure to give the HR blockers or the other medication to prevent the ulcer. So that it wasn't the countermeasure for COVID that caused this. It was the failure to do something else. So I guess the question is whether the failure to give the HR block or the medicine to prevent the ulcer, is that a countermeasure to COVID or is that something else? Well, respectfully, I disagree. I think the plaintiffs are saying the harm was caused by the prednisone. What they're saying is there was negligence in the administration of the prednisone, which they say should have been in conjunction with the prophylaxis. So again, it's the administration or use of a covered countermeasure. So they're saying the use of the countermeasure, the prednisone caused the ulcer. But also there was negligence, they allege, in the administration of the countermeasure because they didn't administer it in conjunction with the prophylaxis. So trying, as the district court did, to say the prophylaxis is a separate and distinct issue, they're clearly intertwined. And once you have a harm caused by the countermeasure itself, the immunity provision is triggered. We'll hear from the appellee. Good morning, your honors. May it please the court, Austin Bursick Johns for the plaintiff appellee, Edward Waters, junior administrator of the estate of Edward James Waters. To the extent it's necessary, I'd like to reserve 30 seconds on the cross-appeal rebuttal. Counsel, can you speak up or move the microphone a little closer to you? Is that better? Much better. I'll speak up. The problem with the defendant's argument is that it simply ignores the fact that none of the plaintiff's allegations are that the defendant was negligent in administering or using a covered countermeasure. There's no getting around that. A covered countermeasure within the meaning of the PREP Act is any medicine used to treat, cure, prevent, or mitigate COVID-19. How about what your colleague just said, that essentially you're alleging negligence in the administration of the steroid arising from the failure to simultaneously give a prophylaxis? Right. The case law and the language of the PREP Act is very clear that when immunity applies, it's when a countermeasure is used, is administered. And you're not disputing that prednisone is a covered countermeasure, is that right? That's right. Okay, so how is it not the prophylaxis? If you can see that prednisone is covered, then how is it not the failure to prescribe a prophylaxis? The case law talks about the fact that a failure, even a failure to prescribe a countermeasure, does not entitle the provider to immunity. And here we're talking about the failure to prescribe something that's not a countermeasure. Even if the gastrointestinal prophylaxis were considered a countermeasure, there's still no liability because it was the failure to prescribe that. But how is that different from a negligence claim? Different than a, I'm sorry? Negligence claim. The plaintiff is alleging medical malpractice, but it's not within the umbrella of the PREP Act. So, there are... So, but I thought the whole point of the PREP Act was to try and protect against debilitating lawsuits like that. The point of the PREP Act is to protect covered persons from administering or using covered countermeasures, and that's not the case here. Okay, but you're not disputing that he used prednisone? There was prednisone involved, but this does speak to the broader issue here, Your Honor, which is, just because a countermeasure is involved, does that excuse a provider from any other negligence that's involved in the provisional order? So, the order is in the negligence claim? It's, the underlying claim is a medical malpractice claim, Your Honor. Well, the statute, I mean, your adversary correctly said that the PREP Act immunity has been characterized as fraud, and the statute doesn't require that a covered countermeasure be the sole or even the primary cause of the loss. You're arguing, essentially, I guess, that the causal relationship, that there's some proximate cause relationship, but I'm having difficulty reconciling that with the language of the statute, and it seems to me that Mills does, is distinguishable, and that the COVID test was in no way the cause of the loss, was independent of the loss in that case, while here, the cause is definitely, or part of the cause, the administration of the prednisone. So, help me understand how I'm misunderstanding. So, I think there are cases like Mills that deal with countermeasures where the claims were permitted because, in my interpretation, what the court's doing when they talk about an independent and distinct cause of the harm, they're really talking about proximate cause, because the cause, in fact, I don't see how you can get around saying that the COVID test was not a cause in fact, or the ventilators were not a cause in fact of the bed sores they were, but what the plaintiffs there alleged was there was a different proximate cause of the harm, and that's why they were allowed to proceed, and I think it's actually... Well, but I'm not exactly sure how that helps. I mean, one, there can be more than one proximate cause, and I think you can't argue that prednisone wasn't one of the proximate causes. Isn't that correct? I mean, he wouldn't have died from the ulcers if he hadn't had the prednisone. It was a cause in fact, but it wasn't the proximate cause. The proximate cause was the many failures, and one of them was the failure to prescribe a gastrointestinal prophylaxis. And the PREP Act speaks to... The term it uses is causal relationship, which doesn't say cause in fact or proximate cause, but when the court interprets those laws, I think it needs to read in the century of case law or more on torts and what causal relationship means, and it always means cause in fact and proximate cause. To uphold the district court's decision here with regard to counts one and two would also comport with other circuit court decisions, such as Hampton v. California, which points to the fact that the non-administration or non-use of a measure does not entitle the provider to immunity. It would also comport with Hudak v. Elmcroft out of the Sixth Circuit, which encompasses the same principle there, that the non-use does not lead to immunity. There were also many other allegations of failures to act here, which I list in a couple of places in the brief. One of them is on page 49. And I think it does all come down to the fact... Part of the thing I'm stuck on is that I understand the statute to say that the sole exception to immunity is where the defendant engaged in willful misconduct. So if it's... How is ordinary malpractice or ordinary negligence not covered by the immunity? The exception for willful misconduct would permit a claim directly alleging that the covered countermeasure was the cause in fact and proximate cause of the harms. I don't understand what you just said. I'm so sorry. So my understanding of that language is that a plaintiff can allege, if the plaintiff here were alleging that the defendant shouldn't have prescribed prednisone, that would be subject to the PREP Act immunity. But if the plaintiff alleged there was some willful misconduct in prescribing... If he had willfully allowed your client to pass away by willfully denying a prophylaxis, he wouldn't be able to get the claim of immunity. But my question is, why isn't ordinary malpractice or ordinary negligence not covered within PREP immunity? Your Honor, I think you're adding a step there. Willfully failing to prescribe the gastrointestinal prophylaxis is what your last question was. And I'm saying the failure to prescribe the gastrointestinal prophylaxis takes it out of the umbrella of the PREP Act. How can that be when it says that the sole exception to the immunity is where the defendant engaged in willful misconduct? I need help from you because I'm looking for the hook for where ordinary negligence or ordinary malpractice is outside of what the PREP Act covers. I read the willful misconduct as being the sole exception saying, you know what, for better or worse, a determination was made that ordinary negligence and ordinary misconduct are available for immunity. What in the text do you see and what do we do about this willful misconduct language? What am I supposed to do with that in terms of interpreting what is covered by the statute and what isn't? The willful misconduct exception applies to the administering or use of a covered countermeasure, and that's not this case. This case is the failure to prescribe something that's not a covered countermeasure. So you're not relying on the exception to willful misconduct that's in the statute. I never understood you to be relying on that. Correct, Your Honor. What you're saying is what I understood your argument to be, and my question now relates to cases that the district court relied on. Wilhelms out of Ohio, Solomon, the district court, Solomon 1, not the remand issue that was decided by this court. How did those cases relate to your case? Because there, as I understand it, it was ventilators were used to treat COVID, and patients died as a result of side effects they developed from the use of the ventilators because of failures by the medical staff to address those side effects by turning the patient, by treating the pressure points, et cetera. But I'm trying to understand how those cases relate to this case. I think this case is exactly like a case like Solomon, where the use of the ventilator, how can you say anything but the ventilator was a cause and effect of the bed sores, and the ventilator was a covered countermeasure. But the court there found that it was the failure to really take standard steps in the practice of medicine by turning a patient on a regular basis. And is that because medical professionals generally understand that if you put a person on a ventilator, whether it's for COVID-19 or some other condition they have, that this type of prophylactic measure of moving the patient should occur? I think that was part of the court's reasoning, Your Honor. And is part of your argument that a reasonable medical provider would understand that if somebody is given a high dose of steroids over a prolonged period of time, or for some time, they should be given an H2 blocker or some other measure to counter the potential side effect, which is what this gentleman was given when he was admitted to the hospital and not treated by Dr. Corey, correct? Correct, Your Honor. Yes. How would you interpret a case that involved a claim that too much prednisone was prescribed, as opposed to the failure to give it prophylaxis? I think if the claim is there was too much of a covered countermeasure, I think that's subject to immunity. But that's not the claim here. The claim here is you failed to prescribe something that's not a covered countermeasure. And I think, maybe I'm harping too much on the point, but I think looking at the term causal relationship in the context of those two prongs, I think, solves all those questions. The proximate cause is how these cases are all reconciled, whether it's the ventilator or the COVID-19 test delaying the heart attack treatment. Of course, that was a cause and effect of the delayed treatment. They were waiting on a covered countermeasure. But there was enough of a distinction, enough of a gap in the causal chain where the court permitted that case to proceed. And I think, I know I'm far over time, if I could briefly conclude, Your Honors. On the PrEP Act, clearly, the court understands the question here is just how far the immunity applies. How far does that shadow fall from the PrEP Act immunity? And is it going to cover anything that is medical negligence just because a countermeasure was involved? I did not address the cross appeal regarding the cup, and I don't try the court's patience, but I did address it in the brief, and I'll rely on the brief. Thank you, Your Honors. Briefly, Your Honors, I'd like to direct the court's attention really to three cases. One is the Franklin case out of the Supreme Court of Oklahoma. I think that case is important because it addresses this issue of issues of negligence versus issues of immunity. The Hampton case out of the Ninth Circuit, 2023, I think is important because, although in that particular case they said the prison industry failed to implement COVID precautions, therefore, there's not a PrEP Act issue. In explaining immunity provision under the PrEP Act, they did say, very importantly, that where the covered countermeasure plays some role in producing the harm, that triggers the immunity. And then the MT case out of the Appellate Court of Kansas, also 2023, I think is very important because it gets to this inaction distinction, which comes up in these PrEP Act cases. And what the MT case said is that PrEP Act covers inaction claims where the inaction claim is related to the covered countermeasure that otherwise is causing the harm. And that's what we have here. We have a covered countermeasure which is alleged to have caused the harm directly, but an alleged failure to use a prophylaxis to mitigate that harm. So they're intertwined. It all has to do with the administration of the covered countermeasure. And I just think that this is much more a kind of case where you take a vaccine, you suffer an adverse effect, and then the store fails to treat you when you fall down. That failure doesn't mean that they're not immunized because the harm was initially caused by the covered countermeasure. I think that's what we have here. Thank you both. And we will take the matter under advisement. The next case is United States v. Stats. Good morning. May it please the Court. Kendra Hutchinson of Federal Defenders for the Appellant in this matter, and Mr. Patrick Sims. I request two minutes for rebuttal. Thank you. And I will not be arguing the second point of the brief and rest on our briefs unless the Court has any questions. This is a parole search case. The Court has clearly and recently instructed that a parole search that is not reasonably related to a parole officer's duties if it is the product of intentionally false, non-existent, or harassing police tips. Unfortunately, the district court here failed to appreciate or apply this law. Can I ask, I found the basis for false, and I found the basis for harassing. Where's the non-existent come from? What case is that? I think that comes from Ray's, Your Honor. I'll look at it. Yeah, I think it's the footnote. I believe it's footnote seven, but I can look that up. I'll look at it again. So I apologize. This is going to feel very much like journalism 101, but I'm interested in the what. So the what is, and I guess the who. Is it that Ms. Dot or Parole Officer Dot was the one that lied, or was it that Officer Zach was the one that lied, or did one of them mislead the other? I felt like the brief was not always linear in that, and if you could just lay out what your theory is. Thank you for asking this so directly, Your Honor, because I think it gets to what is exactly the problem with this case. The district court did not issue findings that clarified these contentions. Defense counsel brought these facts, and these came up months later. This, you know, the prosecution laudably brought forward this tip, and we commend them for that, but the defense brought this to the attention of the district court, and the district court found that there was a factual dispute that Your Honor is, you know, is pointing to here, but did not resolve that dispute, said that I do not need to resolve that because it is undisputed that a tip was given, and so it is not clear. You're right, Your Honor. We do prevaricate in many ways on what happened here because we don't actually know. There is no finding for this court. Well, isn't it the fact that, I mean, a parole, a parole search could be reasonably, could be justified and reasonably related to the needs of parole, whether the tip came from a community person or from an informant? That is true, Your Honor. So you're really relying on the idea that, which we've stated, that a Fourth Amendment violation may take place if there's a law enforcement officer has intentionally provided false information to a parole officer in order to provoke a search? Or if it's harassing, or if it's nonexistent. Yes, yes. But what's the evidence of that, other than the fact that there was a discrepancy that emerged? Yes. And just to, I want, I very much want my Chief's question answered, but is it Dott or is it Zack? Like, who was the one that provided the false information? I think we don't know that here, Your Honor. I mean, Dott, so at the initial suppression hearing, and I'd like to come back to what Your Honor says, but at the initial suppression hearing, parole officer Dott was the only one who testified. And she testified that she heard from Zack, the NYPD officer, that there was a civilian complainant who had personally experienced or witnessed, you know, this brandishing and harassment, right? And so that is what she, that's what she based her decision to make the search on. This is what the court at that time, Your Honor, found was reasonably related to her parole duties when she initiated the search along with her supervisor. Later, months later, the government disclosed that in fact there was a confidential informant who gave this tip. And if you read the texts that the, that the government turned over, that was a part of the, you know. Okay, but you're not making a distinction between whether or not it was a confidential informant or whether or not it was a community member. You're trying to suggest that it either didn't exist or it was done for harassing. Is that right? It doesn't turn on whether or not it was a CI or a community member, or even if they're not one in the same thing. Is that correct? Yeah, well, I think, I think the problem is, is that what Dot testified at the initial hearing, we know is not true. It is not true. So either she lied or somebody lied to her, or, or she was mistaken in some way. But we have more information and some of it is sealed, so I want to be very careful about, we do know we have some evidence of what the communication was between Zach and Dot. There are text messages. So are we speculating about what it was the information? I mean, we know, don't we, that it was a confidential informant. And I thought the district court later looking at it said it's possible she forgot whether it was a community source or a confidential informant because she didn't have her notes, she didn't save the text messages on her phone. So it's not as if the court said, well, there's a real problem here, but I'm going to just ignore it. It's, there's a little bit more evidence about when you have text messages of the communication, there's something for the district court to look at to say, to then conclude, well, she may have thought it was a community source or that's what she was told when she initially testified, but later it turns out it was, it was a CI. But that doesn't change the fact that the defendant knew this, by the way, chose not to perhaps pursue it at trial, perhaps for strategic reasons, but that is not, you know, it's not as if there's a void entirely in what the communications were back in the time when they were relevant. Okay. So, so Your Honor's brought up a lot of, a lot of points. And so, first of all, yes, you're absolutely right. There is a text message, there are text messages that were turned over. They're part of the record in this case. Your Honor's can read them. We've read them. As far as I know, there was no representation from either party that that is the extent of the communications between, that is the full extent of the communications between the two officers, the parole officer and the police officer. You know, we don't know that because the district court did not make that finding, number one. And the district court, as I understand it, said, for now, I'm not going to change my ruling, but I'm going to leave that open for you to pursue it at trial. No one pursued it at trial, correct? And so to get back to what the second part, the judge did say, the judge did not say, oh, you know, I make this finding. The judge says, precisely what she told is certainly disputed. But I don't believe I have to, I don't think I have to rule on that, right? And then in terms of this issue of whether the defense had an obligation to develop this at trial, Your Honor, you know, number one, the government had, had represented that it would be calling the police officer, right? So the defense had already had an opportunity to cross-examine the parole officer, right? And now, now there's something untrue. Wasn't the defense counsel, though, part of, joined the court in kind of beating up the government about saying, wait a minute, I thought we were stipulating that this, you know, came in. We were saying that they could be there from, I'm wondering if one could reasonably read that that strategy was abandoned. I'll tell you why this is not strategy. The government did not call the police officer. There was no police officer there. The government did not call the police officer because the judge and the defense counsel both said, why are you doing that? We don't need them to get it in. We're just going to say that they were searching. How they got there to search is what's going to be at issue. Maybe I'm misreading it, but if you could tell me where I should look to, to not, I think they're going to get up here and say it was abandoned. So if you could tell me where in the record I should look to, to not have that interpretation, I'd appreciate it. If Your Honor would permit me, I will spend my adversary's time to look through the record to find those precise appendix sites so that I can get this right for Your Honor. Great. But I just want to bring us back. You know, we are arguing about what happened at trial, but this is a suppression motion. This evidence should not have gone before the jury in the defense, or that is a defense contention, and the defense is entitled to have that ruled on. The evidence didn't go before the jury. That's the point. There was a motion to suppress, and then new evidence came out just before trial, the text messages. The defense raised the issue of suppression again. The court revisited it and said, you know, maybe something will come up that will change my mind, but for the time being, I'm not granting the motion to suppress. So that's the record here. And now it may be very good strategic reasons that the defense didn't want to bring in those text messages, and that's fine, but it seems to me you can't have it both ways. Your Honor, the evidence that we're seeking to suppress is not text messages or communications. It's the guns. There would not have been a trial had the court, you know, correctly You're seeking to suppress it based on what information the government, or in this case, not the government, the parole officer used to go in the house when they found the guns. Your Honor, I'm unaware of any law that requires a defense attorney to litigate the suppression issues at trial. I understand that that would have, you know, that that would have been great if the defense could have, you know, fleshed out this record even more, but the problem here is that the district court did not flesh out the record. It was the district court Well, I think Rule 12, I mean, generally, a motion to suppress is a pretrial ruling, but with good cause, it doesn't have to be. And so she made a pretrial ruling. Something happened while a jury was about to be called. So are you saying it wasn't within her discretion to go forward as she did? I mean, you know, we're not complaining about going forward with a trial. We are complaining, in fact, and in many ways, if you really get down to brass tacks here, Your Honor, we're complaining about the court's legal error in denying this without making the findings that are required. I would point this Court to Braggs, which I think is really an important case here because it is almost squarely on point. In that case, the government had, or rather, the officers involved had differing rationales. They had one rationale in the morning, one rationale later, and one rationale at trial. Now, this Court affirmed the denial of suppression there, but the precise reason was, was because in footnote 5, however, because the magistrate judge who presided over the evidentiary hearing found the parole officer's testimony regarding the anonymous tip, which was the third rationale, to be, quote, wholly credible, we declined to reinterpret the evidence, as Braggs supposes. So what we have here is a failure to appreciate this part of Braggs, Your Honor. And the Court – honestly, we would not be here if the Court had just said, I find that there was a confidential informant, because, quite frankly, I would be here on clear error review with, you know, with Your Honors. I would say that this was a factual – I'd have to be, you know, disputing that as a factual finding. There are no factual findings here. There's nothing – there's nothing – you know, the only factual finding is that a tip was given. That's it. And we're not complaining – we're not disputing that there was a tip given, really. So, you know, that is what we're asking for here. You know, we've asked for a sort of a broad remedy of reversal and remand. You know, I suppose this would be – this could be a case where the Court could – could remand for additional findings that should have been made in the first place. I mean, this might be an appropriate case for that. We didn't suggest this, and the government really hasn't really brought that up, but that might be the right thing to do in this instance, Your Honor, and – and settle all of these swirling questions that we have. Thank you very much.  Thank you. Reserve rebuttal. MR. GILBERT-RHYNE. Good morning. May it please the Court. My name is Gilbert Rhyne. I'm an assistant United States attorney in the Eastern District of New York, and I represented the government before the district court. The district court properly denied the appellant's motion for reconsideration with leave to renew and did not abuse its discretion. The appellant moved to reopen a suppression hearing on the literal eve of trial in this case, where – where after hours, the parties appeared before the district judge, and the trial was supposed to begin the next morning with opening All the jurors had already been – had already been sworn. So the question in this case is whether or not the district court's decision can be located within the permissible – a range of permissible decisions, and the answer to that question is almost certainly yes. When did the defense get the – the information about the confidential informant? When did they get it, you ask? So the government had disclosed in its gilio letter, I think it was about a month before, the fact that there had been information from a confidential informant that had formed the basis of the NYPD's request. The information about the text messages was provided the date before jury selection was supposed to begin. I believe jury selection was on a Monday. It was provided on a Friday. But there was ample time, obviously, for this to be raised. It was not addressed until the night before jury selection. And the government's position is that it was certainly reasonable for the district judge, given the timing and the circumstances with which the court was faced, the fact that there were jurors who were going to be appearing the next morning in the trial to commence, to say, I'm not going to – to handle this issue now. This is something that I will let counsel develop further during trial through the questioning of witnesses, both in the presence of the jury and outside the presence of the jury. And counsel can raise this issue after trial, if appropriate. It was just never done. And that certainly cannot equate – that there were findings of fact that needed to be made that were not made. Why isn't that correct? Well, because the request here, and a request for further findings of fact, is just based on speculation. Speculation that the information provided by the NYPD was only intended to harass the defendant. I mean, it wasn't – I mean, is speculation a bit hard, considering there was an actual inconsistency and there was testimony that, you know, could not be true with what other records came in later? The fact is that the ultimate decision that the court had to make at the suppression hearing was whether or not the parole search was reasonably related to the parole officer's duties. And as the district judge said in considering this motion to reconsider, there is no dispute about the fact that there was information provided to the NYPD that the – I'm sorry, provided by the NYPD to parole. Okay. But that can't be – it can't be just that there's an information, right? Because then we wouldn't have the Braggs idea that you can't be trying to harass people and you can't be making things up and that sort of thing. So there's got to be some limit. Well, I would say a few things. One, there – in this case, it wasn't just that – this case actually not Braggs. It's actually on a much better footing than Braggs. In Braggs, there was this anonymous tip that was provided by the police to parole. Here, it wasn't an anonymous tip. And in addition to just there being a tip, there was a video that was provided by the NYPD. But that's not the – the dispute I understand your colleague on the other side to be making is that there needed to be factual findings to make sure that it was not – the tip did not materialize because of harassment or because of something – someone trying to be misleading or providing false information. So why isn't there a requirement for providing that kind of factual clarity? In here, the – there can be no suggestion that the tip materialized because there was additional information provided other than just a tip. There was this video that was provided. There was a phone number. But she found it persuasive, right? Yes. Which ended up on its own. Well, the court certainly considered that. And in addition, Braggs talks about the fact of the tip being wholly made up. Here, there's no suggestion that the tip was wholly made up. In fact – But again, the argument that your colleague would be making is that we do not know that it was not wholly made up. We do not know that it was not done for the purpose of harassment. What we do know is that a person who wields a lot of authority said something that we know isn't true. And we don't know why it wasn't true, whether they were confused, whether they misunderstood. But it's not true. And we know that it would be impermissible if it were done because it either didn't – because it was harassing or it was done with the intent of being false. Your Honor, I would say that it's not that Parole Officer Dotz said something that was not true. She did receive a tip from the NYPD, and that tip did lead to the parole search. The question is – But the person about the brandishing and that somebody else was being threatened and all that other stuff? Well, the decision for the court to make at the suppression hearing was whether or not the search was reasonably related to the parole officer's duties. And the search was reasonably related because the officer had been provided with information that the defendant did, in fact, have a firearm. Now – But again, if it were done – that's not the end of the game, right? It can't be done to harass somebody or – I mean – or if it's not true. Like, the fact that you turned up a gun afterwards doesn't immunize the fact that in the beginning, it has to be reasonably related. And we have case law that says something done to harass somebody or something that is not true is not reasonably related. So what the – what Breggs says is that it's if it's wholly made up. However, the subjective – I didn't say that we do not know that it wasn't wholly made up. So that is why I'm asking, was there an obligation on the part of the district court to specifically say, I am finding that it was not wholly made up? I think the answer is no. And the question here is whether or not it was an abuse of discretion. But didn't – didn't the court actually find that it was not wholly made up when the court said – That's what I thought. If anything comes out at trial that changes the picture, you can argue that if there's a conviction. But at this point in time – and this is after having the text messages – it seems it's undisputed that she, Dots, understood that an informant, someone, whether that's a community complainant or an informant, said that he had a gun. Precisely what she was told is certainly disputed. But it's undisputed that she was told that the defendant had a gun. And the court had the text messages. So I don't think – the court says – so I don't think that there's a basis to change the decision on the search. So the court made the fact – the factual premise necessary that her information that he had a gun was sound. So I'm struggling to understand what the factual dispute was that would undermine the court's finding. Yes, Your Honor. And I agree with Your Honor. That is what – that is what the district court was very clear that there was no dispute that the information had been provided to the parole officer by the NYPD. The only question was maybe the identity of who had provided the information. But the fact that the information had been provided itself was not in dispute. Is that because the court made a finding that whether it's an informant, a confidential informant who's paid, presumably in this case, or someone or a community source, that either one is sufficient to support a search? Yes. That is right. That's what the court had said at the time of the suppression hearing's decision and also what the court said in denying what leads to renew the application for reconsideration. I think it is also worth noting – and I'll note that I have only a little bit of time left – that the subjective intention of the police officer is actually not something that is to be considered. The court has been very clear, the law is very clear, that it's an objective inquiry. So whether or not – so the fact remains the question is whether there was a tip in the first place, not why the officers wanted to do a search or anything like that. That does not factor into the analysis in this case. Wait a minute. You're not – you're not suggesting that there are no limits, that – again, you're not undermining the case law that suggests that it can't be done to be false or it can't be harassing? Certainly the government would agree that if a tip had been wholly made up and was done – Which won't agree to harassing? You don't think our law doesn't preclude harassing done for the purpose of harassing? Well, in Ren v. United States, the Supreme Court was clear that the pretext – I'm sorry. I just want – this is actually – the government's position is that a tip done to harass a parolee would be acceptable? If the information is valid, if it is a true tip, if it is genuine, that there really was information that the defendant did in fact have a gun, then the subjective intent as to why the NYPD might choose to pass that information to parole is not part of this inquiry, because the inquiry, again, and under this circumstance is only whether doing the search by the parole officer is reasonably related to the parole officer's duties. So that's why – that is the standard that this court announced in Breds, and there's no further inquiry as to why the tip might have been passed by the NYPD. And so it's the government's position that the court was well within its discretion. It was certainly within the range of permissible decisions for the court to decline to address this issue on the literal eve of trial to give counsel the opportunity to further develop the record, and counsel just did not do that. And so for all these reasons, the government requests that the decision of the district court be affirmed. We'll hear from both. Your Honor, I was not able in this limited time while I was listening to find the appendix sites. I would be happy to file a letter this afternoon if that would be a sister honor. Thank you. That's fine. Just one page. I will. I will not. I will not re-argue the issue. I understand. I can make a reply with one page a week from today. I just want to assist your honors with this. I appreciate it. Thank you. Just – I just wanted to address this sort of issue of speculation that Judge Pettis, that you sort of brought it up. The problem is, is that, you know, the government is saying that it was speculative. It was the government who turned it over, as your honor pointed out. The government turned this over. There was hard evidence. This was not speculative. The speculation could be put to rest with findings. That is all we're asking for here. And didn't the court make those findings? In essence, the court had that information before, and the court said, based – at this point in time, based on what I have, I'm making a finding that there's a dispute as to what precisely she was told may – may have been told, but the court makes some finding that it's undisputed that she was told he had a gun, whether it was from a C.I. or a complainant. Why isn't that enough? What's the dispute here? Judge Cahn, thank you for asking me this, because I really wanted to speak to you and address these questions that you have, because I think they're very important here. We do not disagree that a confidential informant tip could lead to a valid parole search. We have no problem with that. We understand it. The problem here is that there are – there are discrepancies, and there is the possibility of harassment or of falsity on the part of some officer involved here. This court has been very – Harassment by whom? It could be a police officer. It could be a parole officer. We're not sure. I think in Braggs, this court was – But harassment by whom against whom? This court was concerned in Braggs by police officers. So NYPD officer harassment that flows into a tip given to a parole officer that leads to a parole search. Harassment, police officers harassing parole officers to conduct searches? Police officers harassing defendants by – by giving tips to parole officers. Okay. But that's not the issue here, is it? It could be. The court has concrete evidence before it in terms of pictures. I mean, I don't want to get into a description about what's in those text messages, but I saw them. This isn't – and there was a video provided of – now, the parole officer wasn't sure. It was the defendant. I get that, but this isn't – we're not talking about that level of evidence like in Braggs, are we? No. I think what we need here, Your Honor, are findings about who said what to whom and when that happened. I mean, I think that's what we're looking for here. And if it ultimately turns out that it's a CI and a proper tip and, you know, this is a credible CI, I mean, I think we're stuck, right? But, you know, again, I appreciate Your Honor's point, and I think that that could be resolved by findings here. In case the Court has any more questions? Thank you very much. I appreciate it. Thank you both. A well-argued on both sides. That is the final case on the calendar for argument today, so I will ask the Clerk to adjourn Court. Court stands adjourned. Thank you.